851 A.2d 431 (2004)
In re: W.M., S.M., W.B., D.T., M.D., R.H., K.M. & C.P., Appellants.
No. 01-SP-683, 01-SP-684, 01-SP-725, 01-SP-726, 01-SP-739, 01-SP-744, 01-SP-748, 01-SP-824, 01-SP-848, 01-SP-852.
District of Columbia Court of Appeals.
Argued February 21, 2002.
Decided June 3, 2004.
*434 Samia Fam, Public Defender Service, with whom James Klein and Andrea Roth, Public Defender Service, and Robert L. Wilkins were on the briefs, for appellants.
Elizabeth H. Danello, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Roy W. McLeese III, Assistant United States Attorneys, were on the briefs, for appellee.
Before WAGNER, Chief Judge, and REID and GLICKMAN, Associate Judges.
GLICKMAN, Associate Judge:
The District of Columbia Sex Offender Registration Act of 1999 ("SORA"), D.C.Code §§ 22-4001 through 22-4017 (2001), imposes registration requirements on sex offenders who live, work, or attend school in the District of Columbia and authorizes the Metropolitan Police Department to inform the community about them through various means of public notification, including posting their photographs, names, and other personal information on the Internet. In the past decade every state in the United States has enacted such a sex offender registration and notification law, though the terms of the statutes vary from jurisdiction to jurisdiction. Appellants, eight individuals who have been directed to register in the District of Columbia as required by SORA, ask us to declare the legislation unconstitutional. Appellants contend that SORA inflicts punishment and therefore violates the Ex Post Facto, Double Jeopardy, and Due Process Clauses of the Constitution in its application to persons who, like themselves, committed sex offenses before its enactment or were acquitted of sex offenses by reason of insanity. Appellants further contend that even if it is not viewed as a penal enactment, SORA deprives them of procedural and substantive due process by denying them individualized hearings on whether they are presently dangerous and by infringing on their fundamental rights and liberty interests. Appellant W.B. adds the claim, specific to him alone, that the Superior Court denied him procedural due process by assigning the burden of persuasion to him instead of to the government when he sought judicial review of an administrative determination that he is subject to a lifetime registration requirement rather than a ten-year registration requirement.
During the pendency of appellants' appeals to this court, the United States Supreme Court granted two certiorari petitions to consider similar constitutional challenges to the sex offender registration and notification acts of Alaska and Connecticut. Each of those acts is comparable to our SORA. We stayed appellants' cases following oral argument to await the outcomes in the Supreme Court. In Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), the Court held that *435 Alaska's act does not impose punishment and so is not an unconstitutional ex post facto law as applied to offenders who committed crimes before the act was adopted. In Connecticut Department of Public Safety v. Doe, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), the Court held that Connecticut's act did not deny procedural due process by requiring sex offenders to register without affording them a hearing on dangerousness, inasmuch as the registration requirement was based on the fact of conviction without regard to dangerousness. After the Supreme Court issued its opinions, we requested the parties before us to address them in supplemental briefing. In complying with that request, appellants reformulated and expanded their substantive due process claims, and the government responded commensurately. The appeals now are ready for us to decide.
We conclude that the Supreme Court has settled most, though not all, of the issues presented in the instant appeals. In line with the reasoning in the Supreme Court's decision on the Alaska act, we hold that the District's SORA is not punitive. Hence the application of SORA to persons who committed sex offenses before it was enacted or who were acquitted of sex offenses by reason of insanity does not, for either of those reasons, offend the Ex Post Facto, Double Jeopardy or Due Process Clauses. In accordance with the Supreme Court's decision on the Connecticut act, we further hold that SORA does not deny procedural due process by requiring all persons who have committed sex offenses to register without affording them a hearing on their current dangerousness.
Although the Supreme Court did not decide whether the Alaska and Connecticut laws denied substantive due process, as no such claim was raised in either case, we also reject appellants' challenge to the District of Columbia SORA on that ground. We conclude that SORA does not infringe any fundamental rights or liberty interests of appellants and therefore is constitutional so long as it is rationally related to a legitimate governmental goala test the law meets easily.
Finally, we grant appellant W.B.'s individual claim in part. Specifically, we hold that due process requires the government to shoulder the burden of persuasion on the factual issue that determined whether W.B. would have to register for life or for ten years. We further hold that the standard of proof that the government must meet as to that issue is the usual "preponderance of the evidence" standard, not a higher, "clear and convincing evidence" standard that W.B. proposes.

I.

A. The District of Columbia Sex Offender Registration Act of 1999
In 1994, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, 42 U.S.C. § 14071, to address the problem of recidivism by sex offenders. As subsequently amended, the Act required each state and the District of Columbia, as a condition of receiving certain federal funds, to establish a program of sex offender registration and community notification. In response to the Wetterling Act, the Council of the District of Columbia enacted the SORA of 1999.[1] The material registration and notification provisions of SORA, which we shall now describe, are comparable if not identical to *436 those imposed by the sex offender registration laws enacted in numerous other jurisdictions, including those of Alaska and Connecticut that the Supreme Court recently upheld.

Registration
SORA imposes registration requirements on sex offenders based on the nature of the offenses they committed rather than on an individualized assessment of their risk of recidivism. Thus, SORA requires persons who have committed serious sex offenses[2] to register with the Court Services and Offender Supervision Agency ("CSOSA") if they live, reside, work or attend school in the District of Columbia. For purposes of this requirement, a person has "committed" a registration offense if he or she was convicted of the offense, found not guilty of the offense by reason of insanity, or found to be a sexual psychopath pursuant to D.C.Code § 22-3803 et seq. (2001). See D.C.Code § 22-4001(3)(A). The determination that a particular person is required by SORA to register is made in the first instance by either the Superior Court or CSOSA. See D.C.Code §§ 22-4003, -4007. When CSOSA makes the initial determination, it is subject to judicial review in Superior Court. See D.C.Code § 22-4004.[3]
Upon registering, a sex offender is required to provide CSOSA with a photograph, fingerprints and other identifying information, including his or her "name, all aliases used, date of birth, sex, race, height, weight, eye color, identifying marks and characteristics, driver's license number, social security number, law enforcement agency identification numbers, home address or expected place of residence, and any current or expected place of employment or school attendance." D.C.Code § 22-4007(a)(2); see also § 22-4014. In addition, CSOSA is directed to obtain criminal history data and detailed information concerning the sex offense that the registrant committed. The period for which the offender must remain registered with CSOSA depends on the nature of that offense. Offenders who have committed the most serious offenses must register for life; all others must register for ten years or until the end of any period of probation, parole, supervised or conditional release, or convalescent leave, whichever is later. See D.C.Code §§ 22-4001(6), -4002. During the applicable registration period, a sex offender must report any changes of address or other registration information. See D.C.Code § 22-4009(a). Registrants also are required to verify their addresses and other information annually, or in the case of lifetime registrants, quarterly. See D.C.Code § 22-4008(a)(1); 6A DCMR § 409.1.
SORA authorizes CSOSA to adopt procedures to implement the statutory registration requirements. See D.C.Code § 22-4007(a). Among other things, CSOSA is authorized "to direct that a sex offender meet with a responsible officer or official at a reasonable time for the purpose of complying with any requirement adopted by the Agency under this chapter." D.C.Code § 22-4007(b). A sex offender *437 who knowingly violates any requirement of SORA, including any requirement adopted by CSOSA to implement the Act, is guilty of a misdemeanor punishable by a fine of not more than $1,000, imprisonment for not more than 180 days, or both. See D.C.Code § 22-4015(a). Repeat offenders "shall be fined not more than $25,000, or imprisoned not more than 5 years, or both." Id. Additionally, compliance with SORA and CSOSA requirements is a mandatory condition of probation, parole, supervised release, and conditional release of any sex offender sentenced after the law took effect. D.C.Code § 22-4015(b).
CSOSA gathers the information that it collects from sex offenders in a central registry. See D.C.Code § 22-4010(a). SORA directs CSOSA to share this information with the Federal Bureau of Investigation, the National Sex Offender Registry, the Metropolitan Police Department, and other law enforcement and governmental agencies. See D.C.Code § 22-4010(b). Except for records made public in accordance with the notification provisions described below, "no sex offender registration information shall be available as a public record" under the District of Columbia Freedom of Information Act. D.C.Code § 22-4017.

Notification
SORA's provisions for the public dissemination of registrant information are also offense-based. For notification purposes, SORA divides sex offenders into three classes depending on the nature of their registration offenses. Offenders who are required to register for life are in Class A. Ten-year registrants who have committed offenses against minors or sexual abuse of wards, patients, or clients are in Class B. Other ten-year registrants are in Class C. See D.C.Code § 22-4011(b)(2)(A), (B), (C).
SORA authorizes the Metropolitan Police Department ("MPD") to provide both "active notification" and "passive notification" to the public of information concerning registered sex offenders. The statute defines "active notification" to mean "affirmatively informing persons or entities about sex offenders" by any authorized means, including "community meetings, flyers, telephone calls, door-to-door contacts, electronic notification, direct mailings, and media releases." D.C.Code § 22-4011(b)(1)(A). The MPD may provide active notification about Class A offenders "to any person or entity." D.C.Code § 22-4011(b)(3). The MPD also may provide active notification about Class B and Class C offenders to specified groups with particular needs for the information, such as schools and other organizations that serve vulnerable populations, victims and their families, and law enforcement agencies.[4]See D.C.Code § 22-4011(b)(3).
"Passive notification" means "making information about sex offenders available for *438 public inspection or in response to inquiries." D.C.Code § 22-4011(b)(1)(B). "Authorized means of passive notification include, but are not limited to, Internet postings, making registration lists and information about registrants available for inspection at police stations and other locations, and responding to written or oral inquiries in person, through the mail, by telephone, or through email and other electronic means." Id. The MPD may furnish the public with passive notification about sex offenders in any of the three classes, except that Internet postings "shall be limited to information on Class A and Class B offenders." D.C.Code § 22-4011(b)(3).
SORA does not specify what particular information collected from or on registrants may be disseminated to the public by means of active or passive notification. In practice, not everything is published. An MPD regulation provides that the following personal descriptive information may be disclosed publicly for all three classes of registrants: the offender's name and any aliases, date of birth, sex and race, height and weight, eye and hair color, any identifying marks or characteristics, and a photograph of the offender. Other identifying data furnished by registrants, such as their fingerprints, driver's license and social security numbers, are kept confidential and not disclosed to the public. Where the offender resides, works or attends school may be identified "by block only" (i.e., precise addresses are not to be published). The police also may disclose offense information,[5] the date of registration and the date the information last was verified, and whether there is an outstanding arrest warrant for the offender. 6A DCMR § 420.1. SORA requires that "[a]ll publicly disseminated sex offender registration information shall contain a warning that crimes committed against sex offenders will be prosecuted to the full extent of the law." D.C.Code § 22-4011(d).
The record before us does not include information about any specific active notification activities of the MPD but does reveal how the MPD fulfills its passive notification responsibilities. The MPD maintains complete lists of registrants in all three classes with photographs and other information in registry books available for public inspection at all police stations in the city. The MPD also maintains an Internet website at which visitors may inspect the registry of Class A and Class B offenders. See DISTRICT OF COLUMBIA SEX OFFENDER REGISTRY available at http://www. mpdc.dc.gov/ serv/sor/sor.shtm (last visited Mar. 26, 2004). The introduction to the registry on the website includes the following statement:
This information is not intended to create alarm or panic. Our intent is to inform our citizens and to enhance community safety and awareness. The Metropolitan Police Department has not considered or assessed the specific risk of reoffense for any individual registrant included in the registry. In addition, it has made no determination that any offender included in the registry is currently dangerous. Offenders are included in the registry solely by virtue of their conviction record.
Unlawful use of this information to threaten, intimidate, harass, or injure a registered sex offender will not be tolerated *439 and will be prosecuted to the full extent of the law.
http://www. mpdc.dc.gov/serv/ sor/impreminder.shtm (last visited Mar. 26, 2004). The warning against unlawful use of registry information is repeated at various places throughout the website. The "Frequently Asked Questions" section of the site explains that the registry information is provided "not to punish or stigmatize sex offenders, but rather to provide factual information that will allow adults in this community to make more informed decisions about whom they associate with or entrust their children to." http:// www.mpdc. dc.gov/serv/sor /faqs.shtm (last visited Mar. 26, 2004). There are also more ominous-sounding statements. "Remember," it is emphasized, "the purpose of community notification is to reduce the chance of future victimization of persons by this offender. Knowledge of the sex offender should assist you and your family in avoiding the sex offender and becoming a victim." Id.[6] Visitors to the website are cautioned that unless a court has imposed specific restrictions, a released sex offender "has a right to live wherever he/she chooses." Id.[7]

B. The Appellants and the Course of Proceedings
Appellants are eight persons who committed sex offenses before the enactment of SORA and who have been designated as Class A offenders subject to SORA's lifetime registration regimen. Appellant K.M. was convicted of rape in South Carolina in 1969. He was paroled in 1984 after serving fifteen years in prison. K.M. successfully completed parole and has no subsequent convictions. Six of the appellantsW.M., S.M., D.T., M.D., R.H., and C.P.were found not guilty by reason of insanity of either rape or assault with intent to commit rape (plus other offenses, including murder in D.T.'s case) in the District of Columbia between 1975 and 1986. They all are on conditional release from St. Elizabeth's Hospital. Appellant W.B. was found not guilty by reason of insanity of sodomy in 1973. He too enjoys conditional release privileges from St. Elizabeth's Hospital.
In the Superior Court, appellants challenged CSOSA's determination that they were required to register as sex offenders, arguing inter alia that SORA violates the Ex Post Facto, Double Jeopardy, and Due Process Clauses of the Constitution. Appellant W.B. also challenged his designation as a Class A rather than a Class B offender, disputing CSOSA's factual determination, on which his classification depended, that his sodomy offense involved his use of force. The Superior Court rejected appellants' challenges and ordered them to comply with SORA. Each appellant filed a timely notice of appeal to this court.
We eventually consolidated the eight appeals. We also granted a partial stay pending appeal to appellants K.M. and D.T., prohibiting the MPD and CSOSA *440 from posting their registry information on the Internet and limiting active notification in their cases to what SORA permits for Class B and Class C offenders. The other appellants thereafter received identical partial stays from either this court or the Superior Court.

II.

A. Does SORA Inflict Punishment on Appellants in Violation of the Ex Post Facto, Double Jeopardy and Due Process Clauses?
Retroactive application of a law that inflicts greater punishment than did the law that was in effect when the crime was committed is forbidden by the Ex Post Facto Clauses of the Constitution.[8]See Lynce v. Mathis, 519 U.S. 433, 439-41, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997). The Double Jeopardy Clause of the Fifth Amendment protects against multiple criminal punishments for the same offense (among other things). See Brown v. Ohio, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). And the Due Process Clause of the Fifth and Fourteenth Amendments forbids the imposition of punishment on an insanity acquitee. See Jones v. United States, 463 U.S. 354, 369, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). Appellants contend that SORA's registration and notification regime constitutes punishment. If that is so, SORA would contravene each of the foregoing Constitutional principles.
In answering the question of whether SORA imposes punishment, we are guided by the Supreme Court's resolution of the identical question about the Alaska Sex Offender Registration Act in Smith v. Doe, supra. The registration and notification provisions of the Alaska Act are similar to those of SORA. All sex offenders who are physically present in Alaska must register for either fifteen years or for life. The requirement is retroactive and applicable without regard to the current dangerousness of the particular offender. A sex offender who knowingly fails to comply with the Act is subject to criminal prosecution. The offender must submit to being photographed and fingerprinted, provide virtually the same information as the District of Columbia requires, verify the information either annually or quarterly, and notify the police if he or she moves. The information that the offender furnishes is maintained by the Alaska Department of Public Safety in a central registry of sex offenders, and the Department makes much of that information available to the public on the Internet. 538 U.S. at 90-91, 123 S.Ct. 1140. The Supreme Court held that the Alaska Act "is nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause." Id. at 105-06, 123 S.Ct. 1140.
"The framework for our inquiry," the Court said, "is well established"; it focuses on the legislature's intentions and the statute's effects:
We must "ascertain whether the legislature meant the statute to establish `civil' proceedings." Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "`so punitive either in purpose or effect as to negate [the State's] intention to deem it `civil.'" Ibid. (quoting United States v. Ward, 448 U.S. 242, 248-249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we "ordinarily *441 defer to the legislature's stated intent," Hendricks, supra, at 361, 117 S.Ct. 2072 "`only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," Hudson v. United States, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting Ward, supra, at 249, 100 S.Ct. 2636); see also Hendricks, supra, at 361, 117 S.Ct. 2072; United States v. Ursery, 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).
Id. at 92, 123 S.Ct. 1140.
Since the question before us "is first of all a question of statutory construction," id. (quoting Hendricks, 521 U.S. at 361, 117 S.Ct. 2072), we must begin by ascertaining the Council's intent in enacting SORA; did the Council indicate, "either expressly or impliedly," whether it viewed SORA as a punitive or a regulatory enactment? Hudson, supra, at 99, 118 S.Ct. 488. Unlike the Alaska Act, SORA does not include a statement of legislative objectives or state whether it is a civil or a criminal enactment. As we commonly do when statutory language is not dispositive, however, we may look to the legislative history of SORA to determine the Council's objectives and intent. See Seling v. Young, 531 U.S. 250, 262, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) ("Since deciding Hendricks, this Court has reaffirmed the principle that determining the civil or punitive nature of an Act must begin with reference to its text and legislative history."); see, e.g., United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("The legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the pretrial detention provisions as punishment for dangerous individuals."). Bill 13-350, the "Sex Offender Registration Act of 1999," was introduced on July 13, 1999, and was referred the next day to the Council's Committee on the Judiciary. The Judiciary Committee eventually reported favorably on the bill and unanimously recommended its enactment by the Council. We may discern the purposes and intent of the legislation from the Judiciary Committee's Report. See, e.g., O'Malley v. Chevy Chase Bank, F.S.B., 766 A.2d 964, 970 (D.C.2001) ("Because the statutory language is silent on the issue, we look to legislative intent and legislative history" as shown, in this instance, by the report of the Council's Committee on Housing and Economic Development.); In re B.B.P., 753 A.2d 1019, 1022 (D.C.2000) (finding the intent of the statute from the report submitted to the Council by the Committee on Human Services).
The Judiciary Committee Report states that SORA's registration and notification scheme is designed to "promote public safety in at least three ways: by facilitating effective law enforcement; by enabling members of the public to take direct measures of a lawful nature for the protection of themselves and their families; and by reducing registered offenders' exposure to temptation to commit more offenses."[9] The Report goes on to state explicitly that "registration and notification are regulatory measures adopted for public safety purposes, and do not constitute criminal punishment...." Judiciary Committee Report at 6. We think that this is as clear and unequivocal as it needs to be. In Smith the Supreme Court found that "protecting *442 the public from sex offenders"the "primary governmental interest" identified by the Alaska Legislaturewas without doubt "a legitimate nonpunitive governmental objective." Smith, 538 U.S. at 93, 123 S.Ct. 1140 (quoting Hendricks, 521 U.S. at 363, 117 S.Ct. 2072). That such an objective is "consistent with the purposes of the ... criminal justice system ... does not make the objective punitive" when it is pursued in "a regulatory scheme." Id. at 94, 123 S.Ct. 1140.
We are obliged to consider next whether SORA's statutory scheme is "so punitive either in purpose or effect as to negate [the Council's] intention to deem it `civil.'" Smith, 538 U.S. at 92, 123 S.Ct. 1140 (internal quotation marks and citation omitted). Appellants argue that certain features of SORA do contradict the explicit statement of legislative intent in the Judiciary Committee Report and reveal that the Council really did mean to inflict additional punishment on sex offenders. In Smith the Supreme Court recognized that "formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are probative of the legislature's intent." Id. As the Court found in Smith, however, we find here that the probative value of such formal attributes is not sufficient to override what we take to be an unambiguous legislative intention to establish a regulatory rather than a penal scheme. Thus, appellants point to the fact that SORA is codified currently in Title 22 of the District of Columbia Code, which is entitled "Criminal Offenses and Penalties." This is misleading, however. At the time of its enactment, SORA was placed in Title 24, "Prisoners and Their Treatment," which was (and still is) the repository for a number of nonpunitive provisions (e.g., Chapter 5, dealing with the commitment of insanity acquitees and related matters, and Chapters 6 and 7, dealing with the rehabilitation of alcoholics and users of narcotics). SORA was moved to Title 22 only as part of a subsequent recodification of all the laws of the District of Columbia in 2001 that was carried out not by the Council itself but by its Office of the General Counsel pursuant to a delegation of general authority. See District of Columbia Official Code, Preface to the 2001 Edition, at VI (West 2001). As appellee comments in its brief, this post-enactment "administrative decision on which the Council did not even vote ... says nothing about the intent of the legislature when it passed SORA." If "[t]he location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one," Smith, 538 U.S. at 94, 123 S.Ct. 1140, they certainly do not do so in the present case.[10]
Appellants also cite the procedural integration of SORA with the sentencing of sex offenders in Superior Court. When a defendant is found to have committed a registration offense, the Superior Court is required to enter an order "certifying" that the defendant is a sex offender subject to the requirements of SORA and to advise the offender of his SORA duties. D.C.Code § 22-4003(a). As we have already mentioned, SORA further provides that compliance with its requirements "shall be a mandatory condition of probation, parole, supervised release, and conditional release of any sex offender." D.C.Code § 22-4015. And under SORA a sex offender's registration period is to extend *443 as long as the offender remains under such supervisionwhich can be for more than ten years, and up to lifeeven if the offender did not commit a lifetime registration offense. See D.C.Code § 22-4002(a). In addition to such procedural integration, appellants note, the implementation of SORA is committed to two criminal law enforcement agencies, the MPD and CSOSA.[11]
In our view, these features of SORA, which are similar to features of the Alaska law considered in Smith, do not signify that SORA is punitive rather than regulatory in nature. By virtue of their convictions in Superior Court, sex offenders become subject to SORA's requirements, so it makes sense to coordinate the implementation of SORA with the criminal process. The Supreme Court explained in Smith why such coordination does not mean that SORA itself is part of the punishment:
The policy to alert convicted offenders to the civil consequences of their criminal conduct does not render the consequences themselves punitive. When a State sets up a regulatory scheme, it is logical to provide those persons subject to it with clear and unambiguous notice of the requirements and the penalties for noncompliance.... Invoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive.
538 U.S. at 95-96, 123 S.Ct. 1140.
We conclude that the intent of the Council, like that of the Alaska Legislature, "was to create a civil, nonpunitive regime." Id. at 96, 123 S.Ct. 1140. "Only the clearest proof" that SORA is punitive in its effect, therefore, "will suffice to override [the Council's] legislative intent and transform what has been denominated a civil remedy into a criminal penalty." Id. at 92, 123 S.Ct. 1140 (internal quotation marks and citations omitted). Despite the cogency of appellants' objections to SORA as stigmatizing, onerous, and unfair to former offenders who have rehabilitated themselves, we do not think that appellants surmount the "clearest proof" hurdle. The Supreme Court's analysis in Smith of the effect of Alaska's registration and notification scheme is controlling here, for there are only minor differences between that scheme and SORA. Examining the Alaska Act in light of the several indicative factors set out in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963),[12] the Court concluded *444 that the challengers "cannot show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme." Smith, 538 U.S. at 105, 123 S.Ct. 1140. We perforce reach the same conclusion here.
The "most relevant" factors, the Supreme Court stated, "are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." Id. at 97, 123 S.Ct. 1140.[13] In brief, the Court held, first, that registration and public notification have not been regarded historically or traditionally as punishment; in particular any analogy to early colonial "shaming" punishments that were designed to inflict public disgrace would be "misleading," for "[t]he purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender." Id. at 99, 123 S.Ct. 1140.[14] Next, the registration and notification scheme does not impose a significant affirmative disability or restraint.[15] The law "imposes no physical restraint," nor does it "restrain activities sex offenders may pursue." Id. at 100, 123 S.Ct. 1140. Rejecting the comparison with probation or supervised release, the Court emphasized that offenders subject to registration remain "free to move where they wish and to live and work as other citizens, with no supervision." Id. at 101, 123 S.Ct. 1140. Similarly, while registrants must, for example, "inform the authorities after they change their facial features (such as growing a beard), ... they are not required to seek permission to do so." Id. at 101, 123 S.Ct. 1140.[16]
*445 Further, while it is true that the registration and notification scheme promotes deterrence, one of the traditional aims of punishment, "[t]his proves too much," for "[a]ny number of governmental programs might deter crime without imposing punishment." Id. at 102, 123 S.Ct. 1140. It is more important that the scheme undeniably has a rational connection to "a legitimate nonpunitive purpose of public safety, which is advanced by alerting the public to the risk of sex offenders in their community." Id. at 102-03, 123 S.Ct. 1140 (internal quotation marks and citation omitted).
Lastly, the Supreme Court rejected the contention that the requirements of a law like SORA are excessive in relation to its valid purpose, either (1) because the requirements apply to all sex offenders "without regard to their future dangerousness" or (2) because the law "places no limits on the number of persons who have access to the information" disseminated to the public about offenders who are obligated to register. Id. at 103, 123 S.Ct. 1140. As the Court emphasized, "[t]he excessiveness inquiry ... is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Id. at 105, 123 S.Ct. 1140. Thus, a state reasonably "could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism" that is sufficient without more to justify a regulatory response. Id. at 103, 123 S.Ct. 1140. There is ample support for recognizing that "[t]he risk of recidivism posed by sex offenders is `frightening and high.'" Id. (quoting McKune v. Lile, 536 U.S. 24, 34, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) and citing Department of Justice statistics). Accordingly, the Court held, a "State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the Ex Post Facto Clause." Id. at 104, 123 S.Ct. 1140.[17] While individualized assessment may be a necessary predicate where involuntary commitment is concerned, see Hendricks, supra, where only a less intrusive regulatory scheme of registration and public notification is involved, "the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions...." Smith, 538 U.S. at 104, 123 S.Ct. 1140.[18]
*446 The wide dissemination of information about registrants by virtue of its easy accessibility over the Internet does not render the regulatory scheme excessive either, the Court held, relying on three considerations that are equally applicable to SORA. First, the Internet notification system utilized by Alaska "is a passive one: An individual must seek access to the information." Id. at 105, 123 S.Ct. 1140.[19] Second, the website warns visitors against using the information to commit criminal acts. Third, "[g]iven the general mobility of our population, for Alaska to make its registry system available and easily accessible throughout the State was not so excessive a regulatory requirement as to become a punishment." Id.[20] The ease and efficiency with which the Internet can be accessed by the public are, arguably, points in favor of, not against, its use.
The Supreme Court's rationale in Smith applies with undiminished force to the law at issue in this case. We hold that the District of Columbia Sex Offender Registration Act of 1999 is not punitive and does not inflict punishment on appellants in violation of the Ex Post Facto, Double Jeopardy, or Due Process Clauses of the Constitution.

B. Does SORA Deprive Appellants of Procedural Due Process?
Appellants' second contention is that SORA deprives them of procedural due process by infringing on Constitutionally or statutorily protected liberty interestsbroadly speaking, their interests in being free from registration requirements, intrusions on their privacy, and public stigmatizationwithout first affording them a hearing on whether they are, in fact, dangerous. The Supreme Court disposed of the identical contention in Connecticut Department of Public Safety, supra.
Like SORA, Connecticut's sex offender registration act requires all persons in the state who have committed designated sex offenses to register with the Department of Public Safety for ten years or life and requires the Department to publicize the information obtained from registrants on an Internet website and elsewhere. Much like the District of Columbia's website, the State of Connecticut's website explains that offenders are listed "solely by virtue of their conviction record and state law" and adds that the Department of Public Safety "has made no determination that any individual included in the registry is currently dangerous." See Doe v. Dep't of Public Safety ex rel. Lee, 271 F.3d 38, 44, 49 (2d Cir.2001). Despite that disclaimer, the Second Circuit held that the Due Process Clause entitles offenders subject to the Connecticut law to a hearing to determine whether or not they are currently dangerous before the state implicitly labels them as dangerous by identifying *447 them to the public in the sex offender registry. See id. at 46.
The Supreme Court reversed. It held that due process does not require a state to provide a hearing on a fact, current dangerousness, "that is not material to the State's statutory scheme." Conn. Dep't of Public Safety, 538 U.S. at 3, 123 S.Ct. 1160. "Connecticut has decided that the registry information of all sex offenders currently dangerous or notmust be publicly disclosed. Unless ... that substantive rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise." Id. at 7, 123 S.Ct. 1160; see also id. at 8, 123 S.Ct. 1160 (Scalia, J., concurring) ("Absent a claim (which respondent has not made here) that the liberty interest in question is so fundamental as to implicate so-called `substantive' due process, a properly enacted law can eliminate it.")
The District of Columbia too has decided to apply its registration and notification provisions to all sex offenders, whether or not they are currently dangerous. As in Connecticut, such dangerousness is a fact "of no consequence." Id. at 7, 123 S.Ct. 1160. Under Connecticut Department of Public Safety, therefore, if the District's decision does not violate any substantive constitutional requirements, appellants have no right to a hearing on their current dangerousness as a matter of procedural due process.
We have already held that the District's decision does not violate the Ex Post Facto Clause, the Double Jeopardy Clause, or any substantive prohibition on the imposition of punishment to be found in the Due Process Clause. Appellants contend, however, that SORA violates principles of substantive due process in other ways. We turn now to examine that remaining issue, which is one the Supreme Court has not resolved. See Conn. Dep't of Public Safety, 538 U.S. at 8, 123 S.Ct. 1160 ("Because the question is not properly before us, we express no opinion as to whether Connecticut's Megan's Law violates principles of substantive due process."); see also id. at 9, 123 S.Ct. 1160 (Souter, J., concurring) ("[T]oday's holding does not foreclose a claim that Connecticut's dissemination of registry information is actionable on a substantive due process principle.").

C. Does SORA Deny Substantive Due Process by Significantly Infringing Appellants' Fundamental Rights or Liberty Interests?
The Constitutional guarantee of due process of law has "a substantive component, which forbids the government to infringe certain `fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (italics in original); accord, Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ("The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests.") Appellants invoke this principle of "substantive due process." They contend that SORA infringes their fundamental liberty interests by "subjecting them to a lifetime of invasive government monitoring"; stigmatizing them as "registered sex offenders" and "broadcasting their faces and personal information on an Internet registry designed to warn the public of their presence in society until the day they die"; and invading their "right to keep personal information private, particularly their home addresses." Appellants concede that the District of Columbia does have a compelling state interest in doing these things, namely the protection of the *448 community from recidivist sexual offenders. Appellants argue, however, that SORA is not "narrowly tailored" to serve that compelling state interest. Specifically, appellants contend that SORA is overbroad because it designates "all former sex offenders as legal lepers unfit for ordinary society, regardless of whether they pose any threat to public safety at all." Only individualized proof of "actual dangerousness," appellants argue, can justify the restrictions on liberty that SORA imposes.
The substantive due process challenge to an "offense-based" sex offender registration statute that appellants advance with such rhetorical force rarely has been attempted, andto our knowledgeit never has met with success. Most recently, for example, the Ninth Circuit rejected a substantive due process attack on Alaska's law (on remand from the Supreme Court after Smith) in Doe v. Tandeske, 361 F.3d 594, 597 (9th Cir.2004) (per curiam). Acknowledging that the registrants' liberty interests "are indeed important," the Ninth Circuit found itself "forced to conclude" nonetheless that "persons who have been convicted of serious sex offenses do not have a fundamental right to be free from the registration and notification requirements set forth in the Alaska statute." Id; see also Gunderson v. Hvass, 339 F.3d 639, 643 (8th Cir.2003) (holding that because Minnesota's predatory offender registration statute is not punitive in nature, it does not infringe on a fundamental right embodied in the presumption of innocence).
Normally, "[s]tate legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part." Whalen v. Roe, 429 U.S. 589, 597, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). To trigger strict judicial scrutiny of SORA under the doctrine of substantive due process, therefore, it is not enough for appellants to show that the law restricts their liberty or invades their privacy. At a minimum, they must show that SORA impinges on rights and liberties that are "fundamental"[21]a test that is not easy to meet, as the Supreme Court has explained it:
[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," [citing Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)]; Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937).
Glucksberg, 521 U.S. at 720-21, 117 S.Ct. 2258 (holding that the asserted right to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause). "History and tradition are the starting point," though "not in all cases the ending point of the substantive due process inquiry." Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 2480, 156 L.Ed.2d 508 (2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 857, 118 S.Ct. 1708, 140 L.Ed.2d *449 1043 (1998) (Kennedy, J., concurring).[22] If the rights or liberties that SORA affects are not "fundamental" ones, the law need bear only "a reasonable relation to a legitimate state interest" to be constitutional). Glucksberg, 521 U.S. at 722, 117 S.Ct. 2258. The law does not, in that case, have to be "narrowly tailored to serve a compelling state interest."
The Supreme Court has found comparatively few rights and liberties to be "fundamental" for due process purposes. "[I]n addition to the specific freedoms protected by the Bill of Rights, the `liberty' specially protected by the Due Process Clause includes the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity, and to abortion .... We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment." Id. at 720, 117 S.Ct. 2258 (internal citations omitted). A few other rights or liberties have been recognized to belong on the list as well.[23]See also Lawrence, 123 S.Ct. at 2484 (invalidating a Texas law criminalizing the private consensual sexual intimacy of adult same-sex couples whose "right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government").[24]
*450 "That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected...." Glucksberg, 521 U.S. at 727, 117 S.Ct. 2258. To the contrary, "[a]s a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In Glucksberg the Court elaborated on the reasons for its reluctance to characterize rights or liberties as fundamental:
By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," [citing Collins, supra], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court....
521 U.S. at 720, 117 S.Ct. 2258.
The interests in personal freedom and privacy that appellants assert are not among those that the Supreme Court has heretofore declared to be "fundamental" or, as the Court said in Lawrence, "central" to the liberty protected by the Fourteenth Amendment. 123 S.Ct. at 2481 (quoting Casey, 505 U.S. at 851, 112 S.Ct. 2791). Adhering, with due caution, to the exacting standards set forth in Glucksberg, we cannot say appellants' interests are so deeply rooted in this Nation's history and tradition or so implicit in the concept of ordered liberty that they should be added to the fundamental list.
To begin with, we cannot conclude that appellants' interest in being free of SORA's registration obligations is fundamental in a constitutional sense. While the requirements of registration, verification and updating do impose a burden and may be irksome, they do not infringe significantly on appellants' basic liberties. Registrants are not prevented, for example, from changing their physical appearance, or from residing, working, attending school, or traveling wherever, whenever and with whomever they wish. They remain able to go about their daily lives and exercise their rights unimpeded. Registration is intended, to be sure, to facilitate the government's ability to check on sex offenders, but not to a degree that is disruptive of their individual liberty. Nor do the registration requirements of SORA represent as radical a departure from American norms as appellants suggest. Criminal registration laws are not a recent innovation. See Lambert v. California, 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) (noting that such laws "are common and their range is wide"); see also Note, Criminal Registration Ordinances: Police Control Over Potential Recidivists, 103 U. Pa. L.Rev. 60 (1954) (reviewing the (admittedly less than glorious) history of such laws, which became prevalent starting in the 1930s). Furthermore, citizens are obliged in many other contexts to supply information about themselves and their activities to the government and to update that information periodically and sometimes in personfor instance, in connection with paying their taxes, registering for the draft and serving in the military, or applying for public benefits. See Whalen, 429 U.S. at 605, 97 S.Ct. 869. Such duties do not infringe on fundamental liberties.
The collection and subsequent public disclosure of information from registrants that SORA authorizes is an intrusion on *451 appellants' privacy. But there is no constitutional right of anonymity. We may assume that "the individual interest in avoiding disclosure of personal matters" of an intimate or confidential nature may fall within "a constitutionally protected `zone of privacy.'" Whalen, 429 U.S. at 598-99, 97 S.Ct. 869 (upholding a statute requiring the collection of confidential patient drug use information from physicians where the information is safeguarded adequately). Under SORA and its implementing regulations, however, no such sensitive personal information is collected or disseminated to the public; only truthful and accurate information of a non-confidential, mainly public nature is disclosed.[25] Appellants' criminal adjudications, in particular, are matters of public record. The Supreme Court has held that a state violates no fundamental right of privacy protected by the Due Process Clause when it publicizes a person's criminal record. See Paul v. Davis, 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (rejecting contention that police violated respondent's constitutional right to privacy by publicizing his arrest for shoplifting). Nor can appellants successfully maintain that truthful public notification pursuant to SORA jeopardizes a fundamental right or liberty interest by stigmatizing them and damaging their reputations. See id. at 712, 96 S.Ct. 1155 (holding that state official's "defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any `liberty' or `property' interests protected by the Due Process Clause").[26]
Since SORA does not threaten rights and liberty interests of a "fundamental" order, appellants cannot succeed on their substantive due process challenge. As has already been discussed, SORA easily passes rational basis review. Appellants do not contend otherwise. Our rejection of appellants' substantive due process claim therefore disposes as well of their procedural due process challenge to SORA.
The statute thus survives all of appellants' constitutional challenges. We turn to the remaining issue, raised by appellant W.B., which concerns the burden of persuasion and the standard of proof in proceedings in Superior Court to review CSOSA's factual determinations.

*452 III.

A. W.B.'s Challenge to His Classification by CSOSA
In 1969, W.B. was convicted of sodomy with a thirteen-year-old boy in violation of former D.C.Code § 22-3502(a). After his conviction was reversed on appeal in United States v. Bennett, 148 U.S.App. D.C. 364, 460 F.2d 872 (1972), W.B. was retried for the offense in 1973 and adjudicated not guilty by reason of insanity.
Sodomy on a minor is a registration offense under SORA, and if it involved the use of force, it is a lifetime registration offense. See D.C.Code § 22-4001(6)(A), (8)(B). In 2001, CSOSA determined that W.B.'s thirty-three-year-old sodomy offense was forcible and that he therefore was a Class A offender who would have to register for life (rather than a Class B offender who would have to register for ten years). See D.C.Code § 22-4011(b)(2)(A). Although W.B.'s 1973 judgment was silent as to whether he used force to commit his crime (force not being an element of the offense of sodomy as statutorily defined), and CSOSA had been unable to obtain a description of the offense conduct because of the age of the case, CSOSA based its finding on a statement in the D.C. Circuit's opinion in Bennett, supra.[27] The opinion quoted W.B.'s brief on appeal as arguing that his insanity defense had been prejudiced by the jury's exposure to the "unpleasant details" of the "shocking sexual assault on a 13-year-old boy" with which W.B. had been charged. Id., 148 U.S.App. D.C. at 370, 460 F.2d at 878. While the opinion did not state what those "unpleasant details" were, CSOSA construed the quoted statement as an admission by W.B.'s counsel that his offense involved the use of force.
Pursuant to D.C.Code § 22-4004, W.B. sought judicial review of CSOSA's classification determination in Superior Court. In support of his motion, W.B. submitted an affidavit in which he averred that his sodomy offense did not involve force. The offense occurred, according to the affidavit, after he had been drinking and had become "intoxicated." W.B. requested a hearing at which CSOSA would have the burden of proving that he used force. Opposing that request, the government proffered a 1968 police report that purported to recount the victim's claim that W.B. had grabbed him by his arm (i.e., employed force) when he initially refused W.B.'s advances. The government also submitted the D.C. Circuit's opinion in Bennett on which CSOSA had relied.
The Superior Court denied W.B.'s motion without a hearing. Allocating the burden of persuasion by a preponderance of the evidence to W.B. rather than to CSOSA, the judge ruled that no hearing was necessary because W.B. "cannot meet that burden on the record before the court."[28] Accordingly, without specifically finding that W.B.'s sodomy was forcible, the judge certified W.B. as a Class A offender required to register with CSOSA for life. See D.C.Code § 22-4003(d)(4) ("The Court is required to enter an order certifying that a person is a sex offender [when a] motion is filed as authorized under *453 § 22-4004 and the Court denies the motion.").[29]

B. Who Has the Burden of Persuasion and What is the Standard of Proof?
In pertinent part, D.C.Code § 22-4004(a)(1)(A)(ii) provides that a person may seek review in Superior Court of a determination by CSOSA that he is required to register, or to register for life, if the determination "depends on a finding or findings which are not apparent from" his conviction or insanity acquittal as to "[w]hether certain sexual acts or contacts were forcible." The statute is silent, however, as to who bears the burden of persuasion in Superior Court on such a factual issue, and as to the standard of proof. W.B. contends that principles of procedural due process require the government to bear the burden of persuasion and to do so by clear and convincing evidence. The government disagrees on both counts. We hold that the burden of persuasion on the predicate factual issue of use of force belongs with the government. We conclude, though, that proof by a preponderance of the evidence is sufficient.
In deciding what procedures due process requires for a governmental deprivation of an individual's life, liberty or property on the basis of disputed facts or issues, courts must consider three factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail.
Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). These three factors guide our resolution of the narrow burden of persuasion and proof questions before us in the present case.
To begin with, the individual liberty interests at stake may not be fundamental ones for purposes of substantive due process, but they are significant. If nothing else, the registration duties that SORA imposes are a nontrivial restriction on the individual's liberty, and there is a material difference between having to register for ten years and having to register for life. When the government seeks to restrict a citizen's liberty on account of contested facts specific to that individual, it is normally and normatively the government that bears the burden of proving those predicate facts in a fair proceedingnot the individual's duty to disprove them. That norm is intrinsic to SORA's basic scheme, which permits no registration obligations at all to be imposed on an individual unless the government has already proved that the individual committed a registration offense in a judicial proceeding. See D.C.Code § 22-4001(3).
We see no reason to depart from the norm in the present situation, where the duration and extent of the obligations depends on the establishment of other facts in addition to the fact of adjudication. As W.B.'s case illustrates, placing the burden of persuasion on the registrant means that *454 he may be required to register for life rather than ten years on the basis of a contested factual determination that the judge may be unable to make, simply because the registrant has not disproved it. Given the importance of the liberty interest at stake, that outcome appears difficult to justify. It is more consonant with basic fairness, we think, to require the government to persuade the judge that the critical fact is true. So long as the standard of proof is not unduly strict, the government has no substantial countervailing interest. Allocating the burden of persuasion to the government is calculated to reduce the risks of error in a registration disputean interest all parties sharefor it is the government that typically has superior access to official records and witnesses and superior ability to marshal the evidence. Indeed, given that SORA requires CSOSA to make "a finding or findings" on the facts at issue in the first instance, D.C.Code § 22-4004(a)(1)(A), the government should in every case already have done the work and have the evidence at hand. On occasion some facts may be in the exclusive possession of the registrant, it is true; but even then, the government ordinarily has the power to compel their disclosure if necessary, no privilege being applicable. And while it might be suggested that the government has an interest, greater than the registrant's, in an expedited and efficient dispute resolution proceeding, that interest is not in jeopardy. Review proceedings under D.C.Code § 22-4004(a)(1)(A) have a very limited scope to begin with,[30] and merely allocating the burden of persuasion by a reasonable standard of proof to the government is not likely, as a practical matter, to prolong or complicate them (in fact, it may simplify them).
The government argues, however, that a determination by CSOSA comes to the Superior Court with a presumption of regularity, such that the party attacking the determination should shoulder the burden of proving it in error. For example, in Parke v. Raley, 506 U.S. 20, 31, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992), a case on which the government relies, the Supreme Court held that a presumption of regularity attaches to a final judgment of conviction offered to enhance a criminal sentence, and that it is compatible with due process to assign the burden of proof to the defendant who challenges the validity of such a final judgment. Of course Parke is not directly applicable to W.B.'s case or to review proceedings generally under D.C.Code § 22-4004(a)(1)(A), because the pertinent judgment of conviction (or acquittal by reason of insanity) does not disclose the critical fact on which the decision in those proceedings turns. And CSOSA's subsequent determination that an offense involved the use of force is not entitled to the same presumption of correctness as a final judgment of conviction in a court of law.[31] CSOSA is not an *455 adjudicative body like a court, and its processes are not like those of a court. CSOSA is a law enforcement agency within the executive branch of the Federal Government. Its primary responsibility is the supervision of offenders on probation, parole and supervised release pursuant to the District of Columbia Code. See D.C.Code § 24-133(a), (c) (2001). In addition CSOSA is assigned broad responsibilities for overseeing the registration of sex offenders under SORA. See D.C.Code §§ 22-4007 through 22-4010. Where an initial factual determination is made by an administrative agency acting in a non-adjudicative enforcement capacity, due process requires that the person whose rights are affected be able to obtain de novo review by a neutral adjudicator (i.e., in the present case, a court). See Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pens. Trust, 508 U.S. 602, 618, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). While there may be no uniform rule, we think it a corollary of such de novo review that the enforcement agency determination does not benefit automatically from a presumption in its favor.[32] The practical considerations identified in Mathews trump reliance on such a presumption. CSOSA's determination would not be entitled to a presumption of regularity in a proceeding to revoke probation, parole or supervised release; we see little reason to accord such a presumption to its finding of a disputed fact in the context of SORA.
Thus, we hold that when a person disputes CSOSA's finding that "certain sexual acts or contacts were forcible," D.C.Code § 22-4004(a)(1)(A)(ii), due process requires the government to bear the burden of persuasion. Accord, E.B. v. Verniero, 119 F.3d 1077, 1109 (3d Cir. 1997). We do not agree that due process requires the government to meet that burden by more than a preponderance of the evidence, however. The Due Process Clause may mandate heightened standards of proofclear and convincing evidence, or even proof beyond a reasonable doubt when fundamental rights or liberty interests are at stake and the risk of error should be allocated disproportionately to one side (the state), or perhaps when other special factors are present. See, e.g., Santosky v. Kramer, 455 U.S. 745, 761, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights); Addington v. Texas, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (civil commitment). This is not such a case. Appellants' asserted liberty interests are not fundamental ones, and given the government's compelling interest in protecting the public from sex offenses committed by recidivists, it should not bear a disproportionate share of the risk of error. If "preponderance of the evidence" is the appropriate standard for establishing both substantive and technical violations of probation, as we have held, see Johnson v. United States, 763 A.2d 707, 712 (D.C.2000), it is the appropriate standard here.
The judge in appellant W.B.'s case erred in assigning him the burden of persuasion and ruling against him because he did not meet it. We therefore must remand W.B.'s case for the Superior Court to reconsider its decision under a proper allocation of the burden. An evidentiary hearing likely will be necessary, since the outcome may depend on W.B.'s credibility if the trial judge finds the government's *456 evidence sufficient to establish that W.B.'s offense did involve the use of force. See, e.g., Samuels v. United States, 435 A.2d 392, 395 (D.C.1981) (remanding for a hearing on a motion to vacate a sentence pursuant to D.C.Code § 23-110; "[t]he court could not conclusively resolve the dispute without a hearing, for witness credibility typically reflected best through live testimony under oathis key here"). SORA's dispute resolution procedures "follow generally the procedures set forth in D.C.Code § 23-110 for collateral attacks on a conviction," Judiciary Committee Report at 25, and the statute expressly contemplates evidentiary hearings on motions for review of CSOSA determinations when necessary. See D.C.Code § 22-4004(c)(1).

IV.
In conclusion, having held that the District of Columbia Sex Offender Registration Act of 1999 does not violate the Ex Post Facto, Double Jeopardy, or Due Process Clauses of the Constitution, we affirm the orders of the Superior Court requiring appellants to register as sex offenders. In view of our holding as to the burden of persuasion in a review proceeding under D.C.Code § 22-4004(a)(1)(A), we remand appellant W.B.'s case for further proceedings in which the government will bear the burden of persuasion as to CSOSA's determination that he must register as a Class A offender rather than a Class B offender. We will vacate the partial stays that have been in effect for the pendency of these appeals.
So ordered.
NOTES
[1] The 1999 SORA replaced 1996 legislation, D.C. Law 11-274, that was never implemented.
[2] Most sex offenses are within the coverage of SORA, but the Act does not apply, generally speaking, to offenses that are non-assaultive and that do not involve minors. See D.C.Code § 22-4001(6) & (8) (defining the terms "lifetime registration offense" and "registration offense," respectively) and § 22-4016 (excluding offenses between consenting adults and certain other offenses).
[3] The provision for judicial review of a CSOSA determination is discussed more fully in Part III, infra, where we address appellant W.B.'s challenge to his classification and the applicable burden of persuasion and standard of proof.
[4] Specifically, active notification concerning Class B and Class C offenders may be given to:

(A) Law enforcement agencies;
(B) Organizations that deal with or provide services to vulnerable populations or victims of sexual offenses, including but not limited to schools, day care centers, other child care and youth-serving organizations, facilities caring for or providing services to the elderly or persons with impairments, shelters, churches, and victims rights and victims services entities;
(C) Victims of and witnesses to a sex offender's crime or crimes and parents, guardians, and family member[s] of such persons; and
(D) Any person where the Metropolitan Police Department has information indicating that the sex offender may pose a specific risk to that person, and parents, guardians, and family members of such a person.
D.C.Code § 22-4011(b)(3).
[5] Specifically, the police may disclose the "[o]ffense(s) requiring registration, date(s) of conviction, jurisdiction(s) of conviction, and any other registration offense(s), including for all such offenses information concerning the age of the victim and whether the offense was committed against a stranger." 6A DCMR § 420.1(i). Court case numbers also may be disclosed. 6A DCMR § 420.1(j).
[6] The website includes a range of safety tips for children, including suggestions for what to tell them about a sex offender in the neighborhoode.g., to "[k]eep the information general" and "[a]void scary details"; to stay away from the person and not to accept rides, visit or help the person look for a puppy or kitten; to "tell your parents if this person offers you toys, money, gifts, rides, or other stuff"; and to "call 911 immediately if this person approaches you and your parents are not home." Id.
[7] Thus, in addition to the warnings against committing crimes against registrants, visitors to the website are told specifically that they cannot "chase the sex offender out of the community" and should not confront or harass sex offenders living in their neighborhoods. Id.
[8] U.S. Const., Art. I, § 9, cl. 3; Art. I, § 10, cl. 1.
[9] COUNCIL OF THE DISTRICT OF COLUMBIA, COMM. ON THE JUDICIARY, REPORT ON BILL 13-350, "THE SEX OFFENDER REGISTRATION ACT OF 1999," at 3 (1999) [hereinafter, "Judiciary Committee Report"].
[10] It bears noting, too, that despite its name, even Title 22 contains regulatory statutes that are unquestionably nonpunitive. See, e.g., Chapter 39, pertaining to HIV testing of certain convicted offenders. See also Chapter 38, providing for the commitment of sexual psychopaths.
[11] Appellants also cite the fact that in the Sentencing Reform Amendment Act of 2000, D.C. Law 13-302, effective June 8, 2001, the Council authorized the Superior Court in its discretion to sentence criminal defendants convicted of registration offenses to longer terms of supervised release, up to the length of their SORA registration periods, than would be allowed otherwise. See D.C.Code § 24-403.01(b)(4) (2001). This post-SORA legislation does not indicate that the Council viewed SORA itself as punitive; it merely reflects the Council's consistent view that some sex offenders are so dangerous that they may require extended post-release supervision as part of their criminal sentences. Indeed, the authorization of lengthier supervised release terms for sex offenders manifests the Council's recognition that SORA's registration scheme by itself falls well short of the degree of supervision that would be permissible as part of a criminal sentence.
[12] The Supreme Court has explained that for purposes of determining whether a nominally civil (or regulatory) statutory scheme is so punitive in its operation that it must be viewed as a criminal penalty, the seven factors listed in Mendoza-Martinez "provide useful guideposts." Hudson, 522 U.S. at 99, 118 S.Ct. 488. Those factors are:

(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishmentretribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.
Id. at 99-100, 118 S.Ct. 488 (internal quotation marks omitted). "It is important to note, however, that these factors must be considered in relation to the statute on its face, ... and only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty...." Id. at 100, 118 S.Ct. 488 (internal quotation marks and citation omitted).
[13] "The two remaining Mendoza-Martinez factorswhether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crimeare of little weight in this case. The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation." Id. at 105, 118 S.Ct. 488.
[14] "Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." Id. at 99, 118 S.Ct. 488.
[15] "Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow," the Court stated, "not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record. The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take precautions they deem necessary before dealing with the registrant." Id. at 101, 118 S.Ct. 488.
[16] Appellants in the instant case make much of the fact that SORA allows CSOSA to compel registrants to appear in person for verifications and periodic updates, and that CSOSA has exercised this discretionary authority. But occasional in-person meetings may be necessary to effectuate SORA's goalsfor instance, in order to update a registrant's photographand in our view they need not be so onerous in a jurisdiction the size of the District of Columbia as to amount to a significant affirmative disability. The speculative possibility, unsupported by the record before us, that CSOSA might abuse its discretion and impose an excessive personal appearance schedule does not persuade us that SORA "in its necessary operation" subjects registrants to an affirmative disability or restraint. Id. at 97, 118 S.Ct. 488.
[17] "The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences.... `Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application....'" Id. at 103-04, 118 S.Ct. 488 (quoting Hawker v. New York, 170 U.S. 189, 197, 18 S.Ct. 573, 42 L.Ed. 1002 (1898)).
[18] Nor, the Court held, is the duration of the statutory reporting requirements excessive. "Empirical research on child molesters, for instance, has shown that, `contrary to conventional wisdom, most reoffenses do not occur within the first several years after release,' but may occur `as late as 20 years following release.'" Id. at 104, 118 S.Ct. 488 (citation omitted).
[19] Thus, while in theory information on the website is broadcast to the entire world, in actuality the information will be limited mainly to a small and self-selecting subset of the populace that has reason to seek the information.

We do not ignore SORA's active notification provisions, but as with the provisions allowing CSOSA to require in-person interviews, see footnote 16, supra, we do not assume that they will be abused either.
[20] In support of this latter point, the Court cited a study reporting that recidivist sex offenses frequently are committed in jurisdictions other than those in which the previous offenses took place. Of course, it is not only registrants who may move from one jurisdiction to another; any member of the public may be thinking of relocating and therefore have a legitimate interest in checking another jurisdiction's sex offender registry website.
[21] The impingement must be more than minimal. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 386, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed").
[22] It should be borne in mind that we are addressing substantive due process standards for legislative enactments. The Supreme Court has said that the criteria are somewhat different when executive action is challenged as violative of substantive due process. "[I]n a [substantive] due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. at 847 n. 8, 118 S.Ct. 1708.
[23] One treatise organizes the rights not enumerated in the Bill of Rights that the Supreme Court has found to be fundamental, and hence entitled to strict judicial scrutiny under substantive due process principles, into the following six categories: (1) freedom of association; (2) the right to vote and participate in the electoral process; (3) the right to interstate travel; (4) a right to fairness in the criminal process; (5) a right to fairness in procedures concerning individual claims against governmental deprivations of life, liberty, or property; and (6) "a fundamental right to privacy which includes various forms of freedom of choice in matters relating to the individual's personal life," including freedom of choice in marital decisions, child bearing and child rearing. 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 15.7 (3d ed.1999).
[24] Lawrence may be a harbinger of future refinements in substantive due process doctrine, though not such as would affect materially our analysis in this case. See generally Laurence H. Tribe, Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name, 117 Harv. L.Rev. 1894 (2004). Although the High Court did not state explicitly that the liberty interest at stake in Lawrence was "fundamental," Justice Kennedy's majority opinion attached profound importance to the liberty of all "adult persons in deciding how to conduct their private lives in matters pertaining to sex," 123 S.Ct. at 2480decision-making that the majority viewed as integral to the "realm of personal liberty which the government may not enter" and that past decisions of the Court had carved out as fundamental. Id. at 2484 (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). It was unnecessary for the Court to characterize more precisely the liberty interest at stake in Lawrence because the majority of the Justices concluded that the Texas statute at issue "furthers no legitimate state interest" at all that could "justify its intrusion into the personal and private life of the individual." 123 S.Ct. at 2484 (emphasis added). While the law in Lawrence lacked even a reasonable relation to a legitimate state interest, SORA unquestionably does serve a state interest that is not merely legitimate but compelling. Hence under prevailing substantive due process jurisprudence, we consider it our duty in this case to assess whether the liberty interest on which SORA impinges is a fundamental one.
[25] Appellants may have what the Supreme Court has called (in an entirely different context) a "nontrivial" privacy interest in their home addresses. United States Dep't of Defense v. Federal Labor Relations Auth., 510 U.S. 487, 501, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994). But see A.A. v. New Jersey, 341 F.3d 206, 210 (3d Cir.2003) (upholding state's disclosure of registrants' home addresses in Internet registry of convicted sex offenders). SORA does not mandate the public disclosure of appellants' home addresses, however, and under the MPD's implementing regulations, only the block on which a registrant lives is revealed. The "general vicinity" in which a person resides is not "generally considered `private.'" Russell v. Gregoire, 124 F.3d 1079, 1094 (9th Cir.1997) (holding that disclosure of such data pursuant to state sex offender registration act violates no right to privacy).
[26] Cf. Conn. Dep't of Public Safety, 538 U.S. at 9, 123 S.Ct 1160. (Souter, J., concurring) ("[T]oday's holding does not foreclose a claim that Connecticut's dissemination of registry information is actionable on a substantive due process principle. To the extent that libel might be at least a component of such a claim, our reference to Connecticut's disclaimer... would not stand in the way of a substantive due process plaintiff."). The instant appeals do not require us to address whether a due process claim would be available in the event the MPD were to disseminate false and defamatory statements (concerning, for example, a registrant's current dangerousness or responsibility for crimes he did not commit).
[27] SORA does not require CSOSA to hold an evidentiary hearing, and the agency did not do so in W.B.'s case before reaching its conclusion as to his classification.
[28] As to what constituted "the record before the court," the judge stated that she had "considered" the police report submitted by the government, the statement quoted in Bennett, W.B.'s admission in his affidavit that "he was intoxicated and [by implication] cannot recall many details of the offense," and "the fact that petitioner was found to be not guilty by reason of insanity, thus undermining his version of events."
[29] In a motion for reconsideration, W.B. argued inter alia that the judge erred in assigning the burden of proof to him rather than to CSOSA. Insisting that he remembered his offense "vividly," W.B. also argued that the judge had misinterpreted his affidavit (which said only that he did not recall what he had been drinking when he "became intoxicated") and that she should not have deemed him less credible on account of his acquittal by reason of insanity. The judge denied reconsideration without addressing these arguments.
[30] In every case there will have been a prior adjudication of a registration offense and a factual record will have been made. The adjudication is not subject to relitigation. SORA's "offense-based system of sex offender registration is designed to minimize litigation with respect to whether a person must register as a sex offender." Judiciary Committee Report at 8-9. Only certain narrow factual issues (which usually will be determinable from the record of the prior adjudication if not from the face of the judgment) may remain to be addressed in a proceeding under D.C.Code § 22-4004(a)(1)(A)for example, the age of the victim, or whether force was used to commit the offense.
[31] We note that D.C.Code § 22-4004(a)(1)(B) allows a person who is required to register by CSOSA to seek judicial review if the person "asserts that the records establishing that he or she" committed a registration offense "are erroneous." It may be appropriate to assign the burden of persuasion to the petitioner who makes that kind of claim; our holding in this case is not intended to address that question and we express no opinion on it.
[32] Nor is this a situation in which an agency's factual determination deserves deference because special administrative expertise was needed.